# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MARC HOSTETLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-01564-TWP-TAB |
| | ) | |
| CITY OF SOUTHPORT, acting by and through its | ) | |
| police department, THOMAS L. VAUGHN, | ) | |
| individually and in his official capacity as Chief of | ) | |
| Police, and JASON SWANSON, | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendants the City of Southport ("Southport"), Thomas L. Vaughn, and Jason Swanson (collectively, "Defendants") (Filing No. 39). Plaintiff Marc A. Hostetler ("Marc"), initiated this lawsuit, asserting claims under 42 U.S.C. § 1983 as well as under Indiana state law after Defendants conducted a search of his homes and arrested him. The Defendants argue they are entitled to judgment as a matter of law. For the following reasons, the Court **grants** the Motion for Summary Judgment.

## I. BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Marc Hostetler as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). This case and its companion case, *Shara B. Hostetler v. City of Southport*, 1:17-cv-00708-TWP-TAB, arise out of events leading up to and including April

25, 2015, which culminated in a search of both Shara Hostetler's ("Shara") and Marc's homes, as well as Marc's arrest. (Filing No. 40-6.)[1]

Shara and Marc lived together at 7820 Partridge Road, Southport, Indiana (the "Partridge Road residence") for approximately a year before Marc moved out in January 2015, and they remained good friends and co-parents of the son they share. After moving out in January 2015, Marc frequently spent time at Shara's home on Partridge Road, visiting and babysitting his son, as well as Shara's four other children. Marc would sometimes spend the night and "maybe a third of the time" spend the day at the Partridge Road residence, while co-parenting. *Id*. at p. 30. Marc was not on Shara's lease, and he owned his own condominium on Punto Alto Circle located in Indianapolis, Indiana (the "Punto Alto Circle condo").

In 2015, Shara was employed as the secretary for the Warden at Marion County Jail II in Indianapolis. At the time of the searches, Shara was seeking the Republican nomination for Clerk-Treasurer of Southport, Indiana. Marc was supportive of Shara's political ambitions and assisted her with campaigning as well as childcare.

In 2015, Marc was working freelance as a security guard. He had previously worked as a deputy for the Marion County Sheriff from 1999-2002, and a Perry Township Constable from 2002 until January 2005. On January 31, 2005, Marc was arrested for criminal trespass and stalking a former girlfriend. He was ultimately convicted of felony stalking, but that conviction was later reduced to an A misdemeanor upon successful completion of probation. (Filing No. 48-3 at 33.) In November 2007, Marc was charged with battery of a girlfriend's child and pled guilty to D felony battery on January 9, 2009. After his arrest and conviction for the D felony battery,

---

[1] Although they share the same last name, Marc and Shara were never married. In 2012, after the birth of their son, Shara legally changed her last name to Hostetler because she wanted to share the name with her son by Marc. (Filing No. 48-2 at 27.)

Marc was no longer eligible to pursue a career in law enforcement, so he worked "freelance" in various jobs as a security guard. (Filing No. 40-3 at 8.) He also worked part-time and unpaid for the Southport Police Department as a consultant doing background checks on potential hires and serving as Chaplain. (Filing No. 48-3 at 47-49.) The Southport Police Department issued him a uniform and a badge identifying him as a certified chaplain. *Id* at 49.

Defendant Thomas L. Vaughn ("Chief Vaughn") was the chief of police in Southport. His wife, Jane Vaughn, was employed as Southport's Deputy Clerk-Treasurer under Clerk-Treasurer Dianna Bossingham, who was the incumbent and Shara's opponent in the 2015 primary election. (Filing No. 48-3 at 37.) In early 2015, at a Southport City Council meeting, Chief Vaughn received a tip from Ashley Davis ("Davis"), that Marc was "impersonating a police officer again and … he was carrying a firearm." (Filing No. 40-1 at 5.) Davis told Chief Vaughn that she wished to remain anonymous because she was "scared" of Marc. (Filing No. 40-1 at 6.) Davis was Dianna Bossingham's campaign manager and a contributor to Dianna Bossingham's political committee. (Filing No. 48-7 at 5, 10.) Both Marc and Shara believe Chief Vaughn wished to arrest Marc to damage Shara's reputation with voters to ensure that she would lose the 2015 primary election.

In response to Davis allegations, Chief Vaughn responded that he would give the information to a detective and let him check into her complaint. (Filing No. 40-1 at 5.) Jason Swanson ("Swanson"), an unpaid reserve detective on the Southport Police Department was assigned to conduct the investigation. (Filing No. 40-1 at 5, 10.)

A.    **The Investigation**

Swanson had been a volunteer detective for the Southport Police Department since March 2015 (Filing No. 40-2 at 4-6.) Within a week of being hired, he received the telephone call from Chief Vaughn relaying the complaint from Davis that Marc was carrying a firearm and

impersonating an officer. *Id.* at 6. Swanson telephoned Davis, and Davis told him that "she had seen Mr. Hostetler wearing a firearm and that he kept it in his vehicle. She also … believed Mr. Hostetler was representing himself as a police officer." *Id.* Swanson began an investigation, which included checking Marc's Facebook page where he discovered a photograph of Marc wearing a Southport Police Department polo shirt on which the badge emblem is partially visible. *Id.* at 9. Swanson also learned that Marc had a history of arrests and criminal convictions, including the 2005 conviction for criminal trespass and stalking which had been reduced from a felony to an A misdemeanor and the 2009 D felony battery conviction. (Filing No. 40-5, Filing No. 40-3 at 11.)

Early in his investigation, Swanson also learned that Marc used two addresses: a property records search through the assessor's office revealed the condominium he owned on Punto Alto Circle in Indianapolis, and Shara's home on Partridge Road in Southport, which Marc had used as a business address and where he was registered to vote. (Filing No. 40-2 at 7, 15-16.) Swanson sat in his car and surveilled both locations several days a week for approximately a month. *Id.* at 7. He noticed that Marc went to and from the Partridge Road residence almost every day but almost never visited the Punto Alto Circle condo. *Id.* Swanson never observed Marc wearing an officer's uniform or doing anything to suggest he was impersonating an officer, although he did observe Marc wearing tactical gear on his way to his job as a security guard. *Id.* at 8-9. On at least three occasions during his surveillance Swanson observed Marc carrying a handgun on his left hip. *Id.* at 13. Marc denies that he ever carried or possessed a firearm of any type during this time and says the only thing he would carry was his iPhone cell phone. (Filing No. 48-3 at 75.)

Swanson did not arrest Marc when he believed he saw him carrying a handgun; instead he continued his surveillance to see whether Marc would impersonate an officer. *Id.* at 8-9. When

Marc did not impersonate a police officer, Swanson sought a warrant to search the Partridge Road residence.

## B.    **The Searches**

On April 24, 2015, Swanson applied for and received a search warrant from a Marion Superior Court Magistrate to search the Partridge Road residence and Marc's car. The Affidavit for the search warrant presents the following:

> On or about March 16th, 2015, This [sic] affiant received information from an individual known to police and wishes to remain anonymous, that Marc D. Hostetler, DOB [ ], had been representing himself to be a police officer and was in possession of at least one firearm. As recently as February of 2015, the individual observed Hostetler to be in possession of a handgun and observed him to be wearing a shirt that had a Southport Police Department badge emblem on the left breast.
>
> This affiant is familiar with Hostetler because he is a former employee of the Marion County Sheriff's Department and the Southport Police Department. This affiant is aware that Mr. Hostetler was convicted of Stalking as a D felony on February 18, 2005, under Indiana Cause Number 49G17-0412-FD-223584. On October 24, 2007, the court granted Mr. Hostetler's Petition for Alternate Misdemeanor Sentencing and the judgment of conviction was entered as a Class A Misdemeanor. Mr. Hostetler was convicted of Battery as a D Felony on January 8, 2009, under Cause Number 49G16-0711-FD-243299. On April 17, 2015, the court took Mr. Hostetler's Petition for Alternate Misdemeanor Sentencing under advisement. The felony battery conviction precludes Mr. Hostetler from possessing a firearm. In addition, a review of Indiana State Police records by your Affiant indicated Hostetler does not have a handgun permit.
>
> On March 16th – April 18th, 2015, this affiant conducted surveillance on the residence of Mr. Hostetler, as reported by the known complainant, to be located at 7820 Partridge Road, Southport, IN 46227. This affiant observed Mr. Hostetler exit the residence several times during this period with a handgun on his left waistband, specifically on March 20, 2015, April 2, 2015, April 3, 2015, and April 10, 2015. On two of those dates, this affiant observed Mr. Hostetler take the weapon from his waistband and place it in the driver side compartment under the seat or dashboard in his vehicle, a maroon Chevy Avalanche, Indiana license plate number TK690LUU. On one of those dates he then returned to the house. On the other date, he then entered the car and drove away from the residence.
>
> On March 20th, 2015, I conducted a search of Social Media for Marc Hostetler. I located a profile on the website "Facebook" which appears to belong to Mr. Hostetler. A photo added on 11/12/2013 that shows a male, who I recognize as Marc

Hostetler, wearing a Southport Police Department shirt and appears to be a current representation of Mr. Hostetler's appearance.

 (Filing No. 40-7.)  Swanson and other officers executed the search warrant the next day.  They did not find a firearm on Marc's person or in his car.  (Filing No. 48-5 at 2.)  But their search of the Partridge Road residence turned up a loaded pistol under a mattress, which Swanson learned several days later belonged to Shara.  (Filing No. 40-6; Filing No. 48-2 at 55-56, 61-64, 73-76.) Officers also located two .40 caliber Glock magazines stamped "Law Enforcement/Gov't Use Only," a holster for a handgun, and several articles of Marion County Sheriff's Department police clothing.  (Filing No. 40-6.)

While other officers were searching the Partridge Road residence, Swanson prepared an application for a warrant to search the Punto Alto Circle condo, which a judge granted that same day.  (Filing No. 40-12.)  The affidavit supporting that application was the same as the application for the warrant to search the Partridge Road Residence, except it added:

> On April 25, 2015, this affiant executed a search warrant on the residence at 7820 Partridge Rd, in relation to the above information. This affiant located (1) .22 caliber handgun with four (4) bullets inside and the hammer cocked, under the bed in the master bedroom. Also located were police uniforms, Marion County Sheriff's Department uniforms, and 2 magazines for a Glock .40 handgun, marked "Restricted to Law Enforcement/Gov't Use." Upon completion of the search warrant, this affiant was advised by Hostetler that he also owned another property, located at 2807 Punto Alto Circle, Indianapolis, Indiana 46227. This affiant observed the property at this location to be a condominium located on the second story of a two story building with several other single occupancy units. The window of this location has a full size Marion County Sheriff's Department flag. This affiant spoke to a neighbor, known to police, who wishes to remain anonymous who stated that Hostetler had been in her home and advised her he was a police officer and worked nightly at 9pm.

(Filing No. 40-12.)  No firearms were discovered during the search of the condo, but officers did find firearm accessories, such as a holster, a magazine, and gun cleaner.  (Filing No. 40-6.) Officers also recovered several police badges and old identification cards Marc had used during

his prior employment as a law enforcement officer, as well as miscellaneous police insignia pins and patches. *Id.* Additionally, officers found a signal flare device, three multi-point throwing stars, and five multi-point playing card throwing knives. *Id.*

## C.     Arrest and Criminal Charges

After the search of the Partridge Road residence and before the search of the Punto Alto Circle condo, the police arrested Marc. (Filing No. 40-6.) Swanson initially arrested Marc for carrying a handgun without a license. (Filing No. 40-2 at 10.) Following the search of the Punto Alto Circle condo, Swanson recommended additional charges of impersonating an officer and theft. *Id.* The prosecutor declined to charge Marc with impersonating an officer but did charge him with theft, possession of a Chinese throwing star, and carrying a handgun without a license. *Id.* at 11. Eventually, the prosecutor dismissed all charges against Marc following a successful motion to suppress the evidence obtained from the two searches. (Filing No. 48-3 at 124-125.)

After Marc's arrest but before the charges against him were dismissed, Shara met with Swanson at the Southport police station. Shara interpreted their conversation as Swanson urging her to implicate Marc in ownership of the firearm recovered from the Partridge Road residence and threatening her with legal consequences if she did not. (Filing No. 48-2 at 73-76.) Swanson also inferred that the prosecutor was going to file charges that would lead to her "going to jail, losing her job, and losing her kids." *Id.* at 76. But Shara maintained that the firearm belonged to her. Shara was never charged with any crime related to this incident. (Filing No. 48-2 at 26.)

## D.     Procedural History

Marc filed a Complaint asserting claims of illegal search, false arrest, negligence, trespass, defamation, malicious prosecution, and intentional infliction of emotional distress against Chief Vaughn, Swanson, and Southport in state court. (Filing No. 1-1 at 7.) Defendants removed the

case and this Court accepted jurisdiction. (Filing No. 1.) Defendants moved for partial judgment on the pleadings, arguing Marc failed to allege a valid *Monell* or a valid 42 U.S.C. § 1983 claim against Southport or Chief Vaughn, and that Chief Vaughn and Swanson were immune from all of Marc's state law claims except false arrest under the Indiana Tort Claims Act. (Filing No. 13.) The Court granted the motion in part, dismissing Chief Vaughn in his official capacity but not in his individual capacity. (Filing No. 34 at 8.) Marc withdrew his claims for negligence, trespass, defamation, malicious prosecution, and intentional infliction of emotional distress. *Id.* Thus, Marc's § 1983 Fourth Amendment Unconstitutional Search and Arrest claim against Chief Vaughn and Swanson in their individual capacities, his Fourth Amendment Unconstitutional Search and Arrest *Monell* claim against Southport, and his state law false arrest claim against Southport and Chief Vaughn and Swanson (in their individual capacity) remain. Defendants move for summary judgment on all claims. (Filing No. 39.)

## II.    SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 106 S.Ct. 1348 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or

conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

## III.  DISCUSSION

Marc contends that Chief Vaughn "used Jason Swanson as a pawn to procure his arrest to embarrass Shara and boost the prospects of his wife's boss, Dianna Bossingham, to win the election for Clerk-Treasurer." (Filing No. 47 at 15.) He argues that Chief Vaugh and Swanson violated his] rights through unreasonable searches and seizures and that he was falsely arrested. The Defendants argue they are entitled to summary judgment because the evidence does not support a claim that they violated Marc's Constitutional rights and because probable cause supported Marc's arrest, frustrating his state law false arrest claim. Defendants argue that Marc's

Fourth Amendment claims fail because the search of the two properties was not unreasonable, Chief Vaughn was not involved in orchestrating either search, and Chief Vaughn and Swanson are entitled to qualified in immunity. The Court will first address the *Monell* claims before turning to the issue of qualified immunity.

### A. *Monell* Claim Against Southport

A local governmental body is liable under 42 U.S.C. § 1983 when "a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers" is related to the unconstitutional conduct of an employee. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 438 U.S. 658, 690 (1978). There are three ways in which a local governmental body can incur *Monell* liability: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. *Abbott v. Village of Winthrop Harbor*, 205 F.3d 976, 981 (7th Cir. 2000).

### 1. Chief Vaughn's Policymaking Authority

Marc proceeds under the third prong; he argues that Southport is liable because Chief Vaughn, a person with final policymaking authority, instigated the violation of his Fourth Amendment rights. Defendants do not dispute that Chief Vaughn qualifies as a person with final policymaking authority, but they offer two counter-arguments. First, they assert the evidence does not establish a violation of Marc's Fourth Amendment rights because probable cause supported both Swanson's warrant application and Marc's arrest. Second, they argue that Chief Vaughn was not personally involved in ordering Marc's arrest or the search of Shara's home and Marc's condo.

Before determining whether the search violated the Fourth Amendment, the Court must address whether Chief Vaughn had sufficient personal involvement to implicate Southport under § 1983. Marc alleges the following facts tie Chief Vaughn to the ultimate search of the Partridge Road residence and Punto Alto Circle condo: he received the initial tip from Davis (Filing No. 40-1 at 5), he assigned the case to Swanson without informing Swanson of Davis' possible political motivation (Filing No. 40-2 at 6), he was on the telephone with Swanson during the search of Shara's house (Filing No. 48-5 at 2) and physically present for the search of Marc's Punto Alto Circle condo (Filing No. 40-1 at 7), and he turned a blind eye to Swanson's investigation to maintain deniability. Defendants argue that Chief Vaughn never gave any direction to Swanson after assigning him to the case, and that Swanson conducted surveillance and sought the search warrant on his own initiative. *Id.* at 28-30.

This disagreement is a dispute of material fact. Although Defendants have designated evidence that Chief Vaughn was totally uninvolved with the search of the Partridge Road residence. (Filing No. 40-1 at 6-7), Marc has designated evidence indicating Chief Vaughn was giving Swanson instructions during the search of Shara's home (Filing No. 48-5 at 2). This conflicting evidence, viewed in the light most favorable to Marc, provides sufficient evidence that Chief Vaughn had personal involvement to implicate Southport.

## 2. **The Searches**

Defendants challenge Marc's *Monell* claim and argue that Swanson's warrant request did not violate the Fourth Amendment, and thus neither he nor Chief Vaughn acted unconstitutionally as to the searches of the two residences. The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. To prove a violation of the Fourth Amendment for an unreasonable search, Marc must show that the actual search was unreasonable, and in judicial

deception claims under the Fourth Amendment that is done by showing that absent the misrepresentations, the search or seizure was unsupported by probable cause. *Chalmers v. Ballos*, 2015 U.S. Dist. LEXIS 150438, at *1 (E.D. Wis. Nov. 5, 2015). "A warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue." *Knox v. Smith*, 342 F.3d 651, 658 (7th Cir. 2003). An officer acts with reckless disregard to the truth if the officer "entertained serious doubts as to the truth of the statements, had obvious reasons to doubt their accuracy, or failed to disclose facts that he or she knew would negate probable cause." *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (internal quotations omitted) (where an arrest is made pursuant to a facially valid warrant, a plaintiff must show that reasonable officers would have known that the evidence relied upon to request the warrant did not establish probable cause, so that they should never have applied for warrants in the first place).

Marc argues that the searches of the Partridge Road residence and the Punto Alto Circle condo violated his Fourth Amendment rights. He concedes that there is sufficient evidence to link him to the Partridge Road residence. However, he argues that Swanson's affidavit in support of the search warrant request did not establish a sufficient nexus between the suspected crimes and the Partridge Road residence. In particular, he contends Swanson made a false statement in his search warrant affidavit when he said that Marc's felony battery conviction precludes [him] from possessing a firearm.

Marc does not dispute the contents of the evidence found during the search of Partridge Road residence or the Punto Alto condo. He concedes that during the time he was surveilled, he did not have a handgun permit to carry a firearm and his felony battery conviction precluded him

from possessing a firearm. *Id.* at 73-74. Nonetheless, Marc contends no law prohibited him from keeping a firearm in his home or the home of his ex-girlfriend so long as she consented. He explains that in Indiana, serious violent felons, including persons convicted of battery as a Class A, B, or C felony are not permitted to possess a firearm. Ind. Code § 35-47-4-5. Additionally, a person shall not carry a handgun in any vehicle or on or about a person's body without being licensed. I.C. § 35-47-2-1(a). However, he argues that his conviction for Class D felony battery did not make him a "serious violent felon" and he was not convicted of "domestic battery," therefore, under Indiana law, he is allowed to possess a firearm. ([Filing No. 40-5.](#))[2] He relies on Indiana Code § 35-47-2-1(b)-(c) and argues that this statute allows unlicensed possession of a firearm within one's own dwelling or within the dwelling of another person who gives consent.

Marc's argument regarding the legality of his firearm possession is incorrect. It was reasonable–and factually correct–for Swanson to believe that Marc's felony battery conviction precluded him from possessing a firearm. The Case Chronology Summary reflects that on January 8, 2009, Marc was convicted of Battery as a class D felony and the sentenced imposed was 545 days, executed 90 days, suspended 455 days and placed on probation for 365 days. (Filing 40-5 at 5.) Under federal law Marc was a person prohibited from possessing a firearm[3]. Moreover, based upon his observations, it was reasonable for Swanson to believe that a firearm could be found at the Partridge Road residence where Marc spent a significant amount of time, and where he observed Marc carrying what he believed to be a firearm on at least three occasions. *See Allen v. State* 798 N.E. 2d 490, 499 (Ind. Ct. App. 2003) ("… we find that a reasonably prudent person could make a practical, common-sense determination, given all the circumstances set forth in the

---

[2] A person convicted of domestic battery also may not possess a handgun. I.C. § 35-47-2-1(c).
[3] A person convicted in any court of a crime punishable by imprisonment for a term exceeding one year (whether or not they were ever sentenced to or served a day in prison), cannot possess any firearm in any location. *See* 18 U.S.C. 922(g).

affidavit, that there was a fair probability that the weapons used in the series of murders would be found at the apartment"). The Court cannot find the affiant's statement that Marc's felony conviction prevented him from legally possessing a firearm, is a "false statement" because under federal law Marc was a person prohibited from possessing a firearm. Thus, Swanson did not make any false or misleading statements in his warrant affidavit. Accordingly, the Court rejects Marc's argument that the affidavit lacked a sufficient nexus between the items to be searched for and the place to be searched, and there was clearly probable cause for the search warrant and search of both property's.

Regarding Chief Vaughn, even accepting that he was involved with the search, Marc has not designated sufficient evidence to show that the searches of Shara's home and his condo violated his Fourth Amendment rights. Because unconstitutionality is a necessary element of a *Monell* claim and Marc has not designated evidence giving rise to a reasonable inference that his constitutional rights were violated, his *Monell* claim fails as a matter of law as to the searches of each property.

### 3. **The Arrest**

Generally, police must have a warrant to make an arrest. *Herring v. U.S.*, 555 U.S. 135, 136 (2009). But an officer may make a warrantless arrest if he observes a suspect committing a crime or if the officer has probable cause to believe that the suspect has committed a felony. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). "Probable cause for an arrest exists if the totality of the 'facts and circumstances within the officer's knowledge…are sufficient to warrant a prudent person, or one of reasonable caution, [to] believe[e], in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *U.S. v. Paige*, 870 F.3d 693, 699-700 (7th Cir. 2017) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)) (brackets and

ellipsis original).  "Determination of probable cause and reasonable suspicion are normally mixed questions of fact and law, but when 'what happened?' is not at issue, the ultimate resolution of whether probable cause or reasonable suspicion existed is a question of law which we review *de novo*."  *U.S. v. Carlisle*, 614 F.3d 750, 754 (7th Cir. 2010) (internal citation omitted).  Contrary to what its name might seem to suggest, probable cause "demands even less than 'probability," *United States v. Moore*, 215 F.3d 681, 685 (7th Cir. 2000)(quoting *United States v. Burrell*, 963 F.2d 976, 986 (7th Cir. 1992); it "requires more than bare suspicion but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false." *Id*.

Defendants argue Swanson had probable cause to arrest Marc for illegal possession of a handgun because Swanson observed him carrying a firearm during his surveillance and found evidence corroborating the charge during the Partridge Road residence search—"holsters, ammunitions and a handgun either within boxes with Marc's name or next to mail addressed to Marc."  (Filing No. 53 at 3.)  And even if probable cause did not exist for illegal possession of a handgun, the searches uncovered enough evidence to create probable cause for impersonating a law enforcement officer.  *Id.* at 5.

Marc argues probable cause did not exist to arrest him on either charge.  He makes two arguments with regards to the illegal possession of a firearm charge.  He disputes that Swanson observed him carrying a firearm. He points out the firearm found in the Partridge Road residence belonged to Shara and contends that even if the firearm found at the Partridge Road residence were his, he was legally permitted to possess a firearm within his own home or in the home of his ex-girlfriend if she consented.  (Filing No. 47 at 13-14.)

Marc "vehemently denies that it was possible for Swanson to observe him with a gun because he has never carried a gun at any time since his felony conviction." (Filing No. 47 at 14.) Whether Marc carried a firearm at any time during the month of October 2015 is a material question of fact. At his deposition, Swanson testified that he saw Marc with a firearm three different times in the course of his surveillance. (Filing No. 40-2 at 13.) Marc denied that he ever carried or possessed a firearm of any type during the period when Swanson was surveilling him or at any time after his conviction for D felony battery. (Filing No. 48-3 at 75.) These two opposing versions of the facts raise an issue of witness credibility that the Court may not determine at the summary judgment stage. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for the factfinder). Moreover, the Court resolves all material disputes in Marc's favor, as the non-moving party.

However, as noted earlier, the issue is whether Officer Swanson had probable cause for the arrest. Regarding his argument that he was legally permitted to possess a firearm, as noted above, this argument fails because Marc was a person prohibited from possessing a firearm, even in Shara's home. Based upon the totality of circumstances, Officer Swanson had probable cause to arrest Marc for illegal firearm possession.

Next, Defendants argue Swanson had probable cause to believe Marc was impersonating a law enforcement officer based on the following evidence: Davis's tip; the picture Swanson found on Marc's Facebook page in which he was wearing a Southport Police Department polo shirt; Swanson observed Marc wearing tactical style clothing; Marc had a pre-existing history of being on the scenes of crimes; the Partridge Road residence contained two .40 caliber Glock magazines stamped "Law Enforcement/Gov't Use Only" in a box with Marc's name and address, along with

a holster for a handgun; the Partridge Road residence contained a Marion County Sheriff's Department uniform with Marc's last name imprinted on it; the Partridge Road residence contained a white polo shirt with "POLICE" on the back in large letters and "POLICE" above the left breast; and police found a knife, a gun safe, and some old police equipment in Marc's car. ([Filing No. 41 at 32](#).) In addition, Swanson also affirms that he "spoke to a neighbor, known to police, who wishes to remain anonymous who stated that Hostetler had been in her home and advised her he was a police officer and worked nightly at 9 p.m." ([Filing No. 40-12](#).)

Marc also makes two arguments with regards to the impersonation of a law enforcement officer. He argues that most of the evidence supporting the charge of impersonating a law enforcement officer was uncovered at the Punto Alto Circle condo, at which point police had already taken him into custody. ([Filing No. 47 at 14-15](#).) Marc explains that, due to his history in law enforcement, his possession of old police clothing and equipment is not sufficient evidence of impersonating an officer to create probable cause. *Id.* He argues the evidence in Swanson's possession at the time of his arrest did not create probable cause that Marc impersonated a law enforcement officer. In 2015, Indiana Code § 35-44.1-2-6 read:

> A person who falsely represents that the person is a public servant, with intent to mislead and induce another person to submit to false official authority or otherwise to act to the other person's detriment in reliance on the false representation, commits impersonation of a public servant, a Class A misdemeanor. However, a person who falsely represents that the person is:
>
> (1) a law enforcement officer; or
> (2) an agent or employee of the department of state revenue, and collects any property from another person
>
> commits a Level 6 felony.[4]

---

[4] The statute has since been amended. Effective July 1, 2016, it reads:
    (a) A person who, with intent to:
        (1) deceive; or
        (2) Induce compliance with the person's instructions, orders, or requests

Marc argues that the evidence designated by Defendants in support of their motion for summary judgment establishes that he had the *opportunity* to impersonate a law enforcement officer, but the offense of impersonation requires more than just giving off an appearance—it requires an attempt to mislead another person and induce that person to submit to false authority.

Marc was arrested for two felony offenses: Felon in possession of a handgun without a license impersonating an officer, however, he was charged by the prosecutor with possession of a firearm by a felon, theft and possession of the Chinese throwing stars. Although the designated evidence may not provide sufficient probable cause for Swanson to believe that Marc was impersonating an officer, there was clearly probable cause to believe that he illegally possessed a firearm and probable cause for his arrest. Thus, the Court **grants** summary judgment as to Marc's Fourth Amendment *Monell* claim against Southport.

## B. <u>Qualified Immunity</u>

Defendants argue that even if the *Monell* claims were to survive summary judgment, both Chief Vaughn and Officer Swanson are entitled to qualified immunity in their individual capacities. Qualified immunity shields officials from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Allin v. City of Springfield*, 845 F.3d 858, 862 (7th Cir. 2017) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The plaintiff carries the burden of defeating a defendant's claim of qualified immunity. *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 968 (7th Cir. 2003). "Whether a government official is entitled to qualified immunity is a legal question for resolution

---

Falsely represents that the person is a public servant, commits impersonation of a public servant, a Class A misdemeanor, except as provided in subsection (b).

(b) The offense described in subsection (a) is a Level 6 felony if the person falsely represents that the person is:
(1) a law enforcement officer; or
(2) an agent or employee of the department of state revenue, and collects any property from another person.

by the court, not a jury." *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008). When examining a qualified immunity claim, the court considers two questions: (1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Id.* "A right is clearly established if it is sufficiently clear that any reasonable official would understand that his or her actions violate that right, meaning that existing precedent must have placed the statutory or constitutional question beyond debate." *Zimmerman v. Doran*, 807 F.3d 178, 183 (7th Cir. 2015).

Marc argues "[u]nder the facts viewed most favorably to [Marc], Vaughn and Swanson violated [his] rights through unreasonable searches and seizures. The right to be free from this conduct is clearly established." (Filing No. 47 at 19.) He cites two cases outlining the rights Chief Vaughn and Swanson should have known they were violating. The first is *Rader v. State*, 932 N.E.2d 755, 759 (Ind. Ct. App. 2010), which Marc argues establishes "that to obtain a search warrant the government must show a nexus between the suspected crime and the place to be searched." (Filing No. 47 at 19.) Second, he cites *Poole v. State*, 559 N.E.2d 1214, 1215 (Ind. Ct. App. 1990). He asserts this case establishes "that an essential element of Impersonating a Public Servant is the intent to mislead and induce another person to submit to false authority." The qualified immunity inquiry turns on whether the officers acted reasonably. "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Allin* at 862 (quoting *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015)).

1. **Swanson's Qualified Immunity**

As the Court explained above, Swanson did establish a nexus between the items to be searched for and the place to be searched; his belief that the felony battery conviction precludes

Marc from possessing a firearm was true, and Swanson reasonably believed he saw Marc emerging from the Partridge Road residence three times with a firearm. An officer who knowingly or recklessly submitted an affidavit containing false statements may still get qualified immunity if he can establish that he had an objectively reasonable basis for believing the facts in the affidavit were sufficient to establish probable cause. *Starks v. Moore*, 51 F. Supp. 3d 782 (S.D. Ind. 2014) (citing *Malley v. Briggs*, 475 U.S. 335, 355 (1986)). The designated facts show that Swanson requested a warrant to search Shara's house after believing that he saw Marc leave it with a handgun, a magistrate judge granted that request, and when executing the warrant, Swanson found a handgun. Based on that information, Swanson arrested Marc for illegal possession of a firearm. Because the warrant authorized Swanson to search for evidence of illegal possession of a firearm and Swanson found that evidence, it was reasonable for him to believe he had probable cause to arrest Marc without violating the Fourth Amendment. Although the question of whether Swanson saw Marc with a handgun is a fact in dispute, at the time he made the arrest, Swanson was under the impression that he had seen Marc with a handgun. He was not plainly incompetent, nor did he knowingly violate the law by arresting Marc.

## 2. Chief Vaughn's Qualified Immunity

Regarding Chief Vaughn, he was not present at the time of Marc's arrest. The Court has determined that probable cause existed for both search warrants. Although Marc has designated evidence that Swanson was in contact with Chief Vaughn during the search of the Partridge Road residence, he has not designated any evidence that Chief Vaughn would have known any information beyond what Swanson knew. In other words, if we take the facts as most favorable to Marc, Chief Vaughn had all the same information Swanson had. Since that information provided

a reasonable basis for placing Marc under arrest, Chief Vaughn also did not act unreasonably or knowingly violate the law.

Thus, the Court finds Chief Vaughn and Swanson are entitled to qualified immunity and **grants** Defendants' summary judgment as to the § 1983 claims against Chief Vaughn and Swanson in their individual capacities.

## C.    State Law False Arrest Claims

Under Indiana law, a defendant may be liable for false arrest when he or she arrests a plaintiff in the absence of probable cause to do so. *Earles v. Perkins*, 788 N.E.2d 1260, 1265 (Ind. Ct. App. 2003). "If the underlying facts supporting the probable cause determination are not in dispute, the court can decide whether probable cause exists." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993). Moreover, a court can find probable cause as a matter of law "only when no reasonable jury could find that the officers did not have probable cause to arrest." *Id.* "The probable cause determination turns on 'whether a reasonable person, under the facts and circumstances encountered by the arresting officer, would believe that the suspect had committed or was committing a criminal offense.'" *Row v. Holt*, 864 N.E.2d 1011, 1017 (Ind. 2007) (quoting *Earles*). The standard is objective; subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis. *Id.*

The Defendants argue Swanson had probable cause to arrest Marc because of the tip Davis made at the Southport City Council meeting. (Filing No. 41 at 29-31.) They cite Seventh Circuit caselaw to support their assertion that "an identification or report from a single, credible victim or eye witness can provide the basis for probable cause." *Id.* at 30. But if that lone tip were not enough, Defendants argue, Swanson had a wealth of other information at the time of the arrest that created probable cause, including the Facebook photograph he had seen in which Marc was

wearing a Southport Police Department badge emblem on his shirt and the two .40 caliber Glock magazines stamped "Law Enforcement/Gov't Use Only," the loaded handgun, and the police uniforms recovered during the Partridge Road residence search. *Id.* at 32-33.

Marc argues probable cause did not support his arrest for either carrying a handgun without a license or for impersonating a law enforcement officer. (Filing No. 47 at 13-15.) Marc again contends that he could legally possess a gun in his own home because he was not a serious violent felon under Indiana law nor had he committed domestic battery. *Id.* at 13-14. He also claims Davis' tip was insufficient to establish probable cause because it "was a legal conclusion without any supporting detail" and because it is inadmissible hearsay. *Id.* at 14. Last, Swanson did not have probable cause to arrest him for impersonating a law enforcement officer because, even if the uniforms discovered during the search of the Partridge Road residence created probable cause on that charge, Marc was in custody before officers executing the warrant discovered those uniforms. *Id.* at 14-15.

Under Indiana law, an anonymous tip "cannot, standing alone, support a finding of probable cause." *McGrath v. State*, 95 N.E.3d 522, 528 (Ind. 2018) (citing *Jaggers v. State*, 687 N.E.2d 180, 182 (Ind. 1997)). "Instead, the reliability of hearsay from a source of unknown credibility depends on other factors, including (1) the basis of the informant's knowledge or (2) corroboration through independent police investigation." *Id.* The United States Supreme Court has mandated a totality-of-the-circumstances approach to probable cause inquiries based on anonymous tips. *Illinois v. Gates*, 462 U.S. 213 (1983).

> The import of *Gates* is that whether officers had probable cause to arrest is to be considered in light of all information available to them at the time of the arrest, including the tip itself together with knowledge of the informant, any corroboration of the tip, and any other information uncovered by or related to the arresting officer.

*Edwards v. Cabrera*, 58 F.3d 290, 293 (7th Cir. 1995).

In this case, Davis told Swanson that "she had seen [Marc] wearing a firearm and that he kept it in his vehicle. She also said that she believed [Marc] was representing himself to be a police officer." (Filing No. 40-2 at 6.) In his deposition, when asked whether Davis provided any factual detail, Swanson replied, "She did, but I don't recall what specifically she told me about that." *Id.* The designated evidence does not show that Davis provided any factual information to substantiate her tip. But that does not mean the tip could not create probable cause.

The Court takes several factors into account when employing the *Gates* totality-of-the-circumstances analysis to determine whether a tip creates probable cause. Probable cause is more likely to result from a tip when the informant has a history of providing reliable information to police, when the informant is a citizen-informant rather than a police informant, when the informant is known to law enforcement so her credibility can be evaluated, when the informant risks retribution for making the tip, and when the tip includes information that the police can corroborate through investigation. *See Edwards*, 58 F.3d at 293; *U.S. v. Navarro*, 90 F.3d 1245, 1253 (7th Cir. 1996); *Mason v. City of Indianapolis*, 2007 WL 2700193 at *4-6 (S.D. Ind. 2007); *U.S. v. Taylor*, 302 F. Supp. 2d 909, 913 (N.D. Ind. 2004).

Recognizing Marc's political conspiracy theory as an alleged motive for the investigation, arrest and searches, the Court concludes that Davis' tip alone was insufficient to create probable cause for an arrest. Although she was a citizen-informant who the police could contact and question, her tip was almost entirely devoid of facts. She did not say when or where she had observed Marc impersonating a law enforcement officer nor, beyond saying he kept a gun in his vehicle, did she say when or where she saw him with a firearm. She did not say what kind of firearm or even what kind or color of car Marc drove—facts that the police would be able to prove or disprove with investigation. Her tip amounted to a mere accusation—she gave officers Marc's

name and the crimes she thought he committed but did not give any facts to support her accusation. Mere accusations without any factual detail for the police to corroborate cannot give rise to probable cause.

But Swanson was not only relying on Davis' tip when he arrested Marc, he also had the knowledge of facts discovered through his investigation of Marc, which included nearly a month of part-time surveillance. During his investigation he learned that Marc had posted a picture on Facebook that showed him wearing a shirt with a Southport Police Department badge emblem on it and observed Marc carrying a firearm on three separate occasions. ([Filing No. 40-2 at 9](#), 13.) In Marc's deposition testimony, he disputes that he ever carried a firearm during the time Swanson was surveilling him. ([Filing No. 40-3 at 15](#).) When asked if he had anything on his waistband that Swanson might have mistaken for a handgun, Marc said "[t]he only thing I would carry would be my iPhone cell phone." *Id.*

The crucial fact is that Swanson observed Marc carrying what he believed to be a handgun during his surveillance. Under Indiana law, "An officer may…arrest a suspect without a warrant if he observes the suspect committing a crime, or if the officer has probable cause to believe that the suspect has committed a felony." *Thomas v. State*, 81 N.E.3d 621, 625-26 (Ind. 2017). When Swanson saw Marc carrying a handgun, he both observed Marc committing a crime and had cause to believe Marc had committed a felony. Swanson reasonably believed Marc had violated state law and in fact, federal law prohibited Marc, who had a felony conviction on his record, from possessing a firearm.

To prevail on a claim of false arrest, a plaintiff must prove the absence of probable cause. *Row at* 1016. Because Marc has not met this burden, the Court **grants** the motion for summary judgment on the state law claim for false arrest.

## IV.  CONCLUSION

Marc has not raised any material fact calling into question the officers' belief that they had probable cause to request the search warrants or to arrest him, and he is unable to state a constitutional violation as required by § 1983 or state a claim for state false arrest.  For the foregoing reasons, the Defendants' Motion for Summary Judgment (Filing No. 39) is **GRANTED**. Summary judgment is **granted** on all the claims, and this action is **dismissed**.

   **SO ORDERED.**

Date:  2/25/2019

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Jeffrey S. McQuary
BROWN TOMPKINS LORY
jmcquary@btlmlaw.com

R. Jeffrey Lowe
KIGHTLINGER & GRAY, LLP-New Albany
jlowe@k-glaw.com

Whitney Elizabeth Wood
KIGHTLINGER & GRAY, LLP (New Albany)
wwood@k-glaw.com